# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 29
Sofia Fasolas, &c.,
  Respondent,
   v.
Bobcat of New York, Inc., et al.,
  Defendants,
Bobcat of Long Island, Inc., et al.,
  Appellants,
Port Jefferson Rental Center, Inc.,
&c.,
  Respondent.


Brendan T. Fitzpatrick, for appellants.
Andrew H. Pillersdorf, for respondent Fasolas.
Scott C. Watson, for respondent Port Jefferson Rental Center.
Defense Association of New York, Inc., amicus curiae.



DiFIORE, Chief Judge:

  In Scarangella v Thomas Built Buses (93 NY2d 655 [1999]) we recognized an

exception to the general rule of strict products liability for design defects, where the

manufacturer offers a product with an optional safety device and the purchaser chooses not

- 1 -

to obtain it. In this case, we must examine whether the exception is categorically unavailable when the allegedly defective product came into the injured end user's hands through the rental market, rather than by a purchase transaction. We conclude that no such "rental market" exclusion from <u>Scarangella</u> is appropriate, and that jury instructions incorporating the rental market theory espoused by plaintiff's expert were misleading and incompatible with governing precedent. Accordingly, we reverse the Appellate Division order and remit for a new trial as to the manufacturer's liability.

Elias Fasolas was killed while operating a Bobcat S-175 "skid-steer" loader (the loader) with a bucket attachment when a small tree entered the open operator cab, crushing him. Fasolas obtained the loader from defendant Port Jefferson Rental Center, Inc. d/b/a Taylor Rental Center (Taylor), a retail rental center, pursuant to a two-day rental contract. Defendant Bobcat Company manufactured the loader and defendant Bobcat of Long Island, Inc., a distributor (collectively, Bobcat),[1] sold it to Taylor in November 2006, along with three others at a price of approximately $22,000 each. Taylor had similarly purchased twenty S-175 loaders with bucket attachments from Bobcat during the preceding decade, which were rented to a diverse clientele including schools, fire departments, churches, local businesses, contractors and homeowners. Plaintiff Fasolas' estate brought strict products liability claims against Bobcat and Taylor on defective design and failure to warn theories, among others.

---

[1] Bobcat of Long Island, Inc. is a d/b/a of Bobcat of New York, Inc., which is named in the caption along with Bobcat of London, which is not mentioned in any allegations in the complaint. Only Bobcat Company and Bobcat of Long Island, Inc. appear in this Court.

The Bobcat S-175 loader is a ride-on machine that can be used for multiple light construction functions. It consists of a motorized base with wheels and hydraulic arms that can be raised and lowered. The loader can be used for different functions when connected to different attachments.  It has an open front operator cab and includes rollover protection and fall protection systems as standard safety features.  According to the manufacturer, the cab is open for easy use, convenient entry and exit and to promote operator visibility.

The loader can accommodate up to 150 different attachments, which are purchased separately.  Each attachment performs a different function, enabling the machine to be customized for use for a variety of distinct tasks.  The bucket attachment, which is available with or without teeth, is intended to be used to level soil and pick up or transport dirt, broken branches and other loose debris.  A bucket with teeth, the attachment on the loader rented by Fasolas, is also able to dig up and loosen hard-packed earth.  Some attachments – such as the "brush saw" and "jackhammer" – come with a "special applications kit" as a standard feature due to the potential for flying debris to enter the cab during the types of operation calling for those attachments.  The special applications kit consists of a top, rear windows and front door made of a half-inch-thick plexiglass called "Lexan" ("the door kit") and can be attached to the loader to enclose the cab and thus restrict airborne material from entering that area.

Although it came standard with some attachments, the door kit could also be purchased as an optional component at an approximate cost of $800 to $1000 and used when the loader was equipped with the bucket attachment.  However, Bobcat did not recommend the door kit for use with a bucket attachment like the one rented to Fasolas,

since debris would not be expected to fly into the cab if the bucket was used as intended – to dig or move soil and other loose debris. According to Bobcat, the loader with bucket attachment was not intended to be used to knock down rooted trees, as other attachments were available for that function.

The precise circumstances surrounding Fasolas' rental and use of the loader remain unclear. However, Taylor employees testified that it was standard practice to carefully question each prospective renter of a loader about the intended use of the product, explaining that they would refuse to rent the loader with bucket attachment for inappropriate tasks, such as removing tree stumps. According to the investigating detective, the 9-foot-tall tree that killed Fasolas was still rooted in the ground and apparently slid past the loader's bucket attachment, entering the open cab. Post-accident photographs admitted at trial show the loader that Fasolas was operating at rest in an area comprised of brush and small trees.

As relevant here, plaintiff alleged that the loader was defectively designed because it did not incorporate the optional door kit.[2] At trial, plaintiff's expert testified that the failure to include the door kit as a standard feature for any S-175 loader with bucket

_____

[2] Plaintiff also raised a defective warning claim, alleging that Bobcat and Taylor failed to properly advise and train Fasolas on the availability of the door kit and the proper use of the loader. However, because the jury credited the failure to warn theory only as against Taylor (who is not an appellant in this Court), that claim is not at issue in this appeal brought by the Bobcat defendants. Indeed, Taylor appeared in this Court as a party respondent and joined plaintiff in defending the judgment, arguing that the Scarangella exception is inapplicable and that the jury charge was correct. Thus, Taylor's liability to plaintiff (under any theory) is both settled given the finality of the judgment as against it and beyond the scope of this appeal.

attachment destined for the rental market was a "design defect" and that the Lexan door could have saved Fasolas' life by deflecting the tree from entering the cab. He conceded that the loader as configured without the door kit was not defective for all uses.  His theory was that the defect was present when the product was placed in the "rental market" because, in his view, this created the potential for an untrained end-user to use the product in a manner for which the optional door kit would be recommended.  Thus, the expert further opined that every piece of equipment going to the "rental market" needed "all of the safety devices available."  The expert did not offer a basis for the implicit conclusion that a purchaser of the product would necessarily have more training or experience than a renter or would be better able to do without optional safety devices.  Moreover, the expert admitted that the loader and the cab's opening complied with all industry standards for skid-steer loaders and represented industry "best practice"; he conceded that no industry writing, standard or expert supported his opinion that a loader sold to a rental company required a door kit as a standard feature.

Bobcat's position at trial was that the S-175 loader with bucket attachment was not defective without the door kit when used for its intended purpose – to move soil.  Bobcat contended that Taylor had been made aware of the availability of the door kit through a variety of means, including handbooks and safety manuals accompanying the machines, and conversations between employees of Bobcat's distributors and Taylor's employees. Bobcat's employees testified that, upon delivery of each loader to Taylor, each item on a general checklist was checked off (ostensibly indicating it had been discussed), including the availability of the optional door kit.  Bobcat's theory was that Fasolas misused the

product by attempting to plow over or dig up trees, which was not a proper use of the loader with bucket attachment. The manufacturer's employees explained that different attachments for the loader are available for leveling trees and include the door kit as a standard feature to prevent airborne material from entering the cab.

At the close of plaintiff's case, the Bobcat defendants moved pursuant to CPLR 4401 for judgment as a matter of law dismissing the complaint against them, contending, among other things, that they could not be liable for failing to make the door kit a standard feature and should be relieved from strict liability under Scarangella. Tracking the 3-pronged Scarangella test, Bobcat argued that (1) Taylor, the purchaser, was thoroughly knowledgeable about the loader with the bucket attachment and actually aware that the door kit was available; (2) under normal circumstances of use the loader with bucket attachment was not unreasonably dangerous without the optional door kit; and (3) Taylor was in a superior position than Bobcat to balance the benefits and risks of not purchasing the optional safety kit for the product's contemplated use by its clientele, including Fasolas.

The trial court reserved decision on the motion and denied Bobcat's request that the jury be instructed to consider whether Bobcat satisfied the Scarangella test. In its strict product liability charge, over Bobcat's objection, the court departed from the pattern jury instructions (PJI 2:120), fashioning a new charge advising the jury that it could find that the loader was "defective if it's not reasonably safe, and in this case we mean reasonably safe to be put in the rental market (emphasis added)." The jury was also instructed to consider whether the loader was defective because it did not "include a protective front door . . . for the purposes of being rented (emphasis added)." Additional modifications,

similarly incorporating the rental market theory propounded by plaintiff's expert, permeated the charge.

The jury found that Fasolas was not at fault and rendered a verdict in favor of plaintiff, awarding $1 million in damages and finding the Bobcat defendants and Taylor liable on the defective design theory. It did not credit the failure to warn theory as against Bobcat but found that Taylor's warnings were defective and that its training of the deceased was inadequate. Twenty-five percent of the fault was apportioned to each Bobcat defendant and fifty percent to Taylor.

The court denied Bobcat's motion to set aside the verdict, rejecting the argument (among others) that the court erred in modifying the product liability charge to reflect the "rental market" theory. The court reasoned there were "two streams of commerce into which the [loader] . . . was released and to which the Bobcat Defendants owed a duty," and it was the "home owner, non-professional occasional renter who deserved protection from such dangers as befell the Plaintiff's decedent herein" (internal quotation marks omitted).

The Appellate Division affirmed, framing the question as "whether the manufacturer and seller of a product that is allegedly defective because of the absence of an optional safety device can invoke the Scarangella exception to liability where the product was sold to a buyer which, in turn, rented the product to the ultimate consumer" (150 AD3d 147, 150 [2d Dept 2017]). The court answered that question in the negative, holding "that the Scarangella exception is not applicable where, as here, the product is sold to a rental company" (id. at 150-151). The court reasoned that Bobcat knew "Taylor would be renting the loader to persons over whom Taylor had no control, and who might lack any experience

operating heavy equipment." The court further speculated that Taylor had little motivation to engage in a reasonable risk-benefit analysis because its agent who purchased the machine "was not at risk of personal harm through use of the loader without the optional safety device" (id. at 156). The court distinguished Taylor's position from that of the buyer in Scarangella, an employer in control of the worksite where its employees would be mainly at risk.

We granted the Bobcat defendants leave to appeal to this Court (31 NY3d 906 [2018]). Because we do not adopt the rental market distinction as a limitation on our holding in Scarangella and conclude that plaintiff's expert's theory was improperly incorporated into the strict products liability instruction charged to the jury, we reverse the Appellate Division order and remit for a new trial as against them on the design defect claim.

Our recognition of the strict product liability cause of action in Codling v Paglia (32 NY2d 330 [1973]) rested on the principle that the manufacturer is in a superior position to know when its product is suitably designed and safely made for its intended purpose. Thus, imposing strict liability on the manufacturers for defects in the products they manufactured "should encourage safety in design and production, and the diffusion of this cost in the purchase price of individual units should be acceptable to the user if" it results in added assurance of protection (id. at 341). Although originally applied to cases involving manufacturing defects, the cause of action evolved to include claims based on defective design (Voss v Black & Decker Mfg. Co., 59 NY2d 102 [1983]) and inadequate warnings (Liriano v Hobart Corp., 92 NY2d 232 [1998]).

"[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use" and "whose utility does not outweigh the danger inherent in its introduction into the stream of commerce" (Voss, 59 NY2d at 107 [internal quotation marks and citation omitted]).  In a design defect case, the question for the jury "is whether after weighing the evidence and balancing the product's risks against its utility and cost . . . the product as designed is not reasonably safe" (id. at 109).  In Voss, we identified a series of factors that are relevant to the jury's risk-utility analysis, including: (1) the product's utility "to the public as a whole and to the individual user; (2) the nature of the product – that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design" (id. [internal citations omitted]; Yun Tung Chow v Reckitt & Colman, Inc., 17 NY3d 29, 34 [2011]).  These factors are "rooted in a recognition that there are both risks and benefits associated with many products and . . . instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits" (Denny v Ford Motor Co., 87 NY2d 248, 257 [1995]).

In Scarangella (93 NY2d 655), we recognized an exception to the general rule of strict liability for design defects, where the manufacturer offers a product with an optional

safety device that is not a required accessory, the purchaser chooses not to buy it and an injured party claims the product is defective due to the absence of the accessory. There, the plaintiff – a bus driver – was injured when struck by a bus that was being operated in reverse by a co-worker. She brought a defective design claim against the bus manufacturer, claiming the bus should have been equipped with an automatic back-up alarm because a driver always has a substantial blind spot when operating in reverse. The manufacturer offered an optional back-up alarm but plaintiff's employer declined to purchase it because it was noisy and the employer was concerned about receiving complaints from the bus yard's suburban neighbors, instead opting to instruct drivers to sound the horn when reversing.

In determining that the manufacturer should not be liable for the accident, we held that a product is not defective -- and a manufacturer or seller is not strictly liable for a design defect based upon a claim that optional safety equipment should have been a standard feature -- when the following three conditions are met: "(1) the buyer is thoroughly knowledgeable regarding the product and its use and is actually aware that the safety feature is available; (2) there exist normal circumstances of use in which the product is not unreasonably dangerous without the optional equipment; and (3) the buyer is in a position, given the range of uses of the product, to balance the benefits and the risks of not having the safety device in the specifically contemplated circumstances of the buyer's use of the product" (id. at 661 [emphasis in original]). When these elements are present, "the buyer, not the manufacturer, is in the superior position to make the risk-utility assessment, and a well-considered decision by the buyer to dispense with the optional

safety equipment will excuse the manufacturer from liability" (id.).

There is no claim here that Scarangella was wrongly decided. Rather, the dispute is over whether the exception is categorically unavailable to a manufacturer that sells its product to purchasers known to rent the product to the public. Bobcat asks this Court to reject the holding below that Scarangella has no application where "the product is sold to a rental company" – a conclusion apparently reached by no other court. The trial court denied Bobcat's request for a Scarangella charge and altered the pattern jury instruction based on the rental market theory of plaintiff's expert. The Appellate Division reasoned that Scarangella was not available here because, as a rental agent, Taylor did not retain "control" over the loader's use and thus could not have been in a superior position to engage in the risk-utility analysis required by prong three. We do not agree.

Both courts misinterpreted the third Scarangella factor which requires consideration of the purchaser's ability, in light of the possible uses of the product, to assess the risks and benefits of purchasing the safety device given the circumstances and the contemplated uses of the product at the time of acquisition. For these purposes, the contemplated "use" of the product was not "rental" or "placement in the rental market" – that is merely the process by which the product came into the hands of the end user. The preoccupation with this process deviates from our analysis in Scarangella by shifting the focus away from the purchaser's knowledge of the product and ability to make a reasoned judgment concerning the utility of the safety feature and toward the nature of the marketplace through which the product passed.

Bobcat's theory was that the loader was not unreasonably dangerous without the optional door kit when used for its intended purpose of moving soil and that Taylor knew its own clientele and was in control of who would have access to the loader (i.e., its rental customers) and for what purpose. Thus, it argued that Taylor was in a superior position, given the wide range of uses of the product, to balance the benefits and risks of not purchasing the door kit in the specifically-contemplated circumstances of its clients' intended uses. Taylor's status as a retail rental company does not establish, as a matter of law, that it was not in a position to engage in the balancing analysis contemplated by the third prong of Scarangella. Without question, whether the buyer exercises control over the product's use in its capacity as an employer or otherwise is a consideration that is relevant to a determination of the buyer's relative "position" to engage in the proper balancing inquiry – but it is not dispositive.[3] A lessor may be able to appropriately mitigate risk by carefully controlling to whom it rents its products and for what use. In this case, testimony was presented that Taylor rented its products to businesses, contractors, schools and other community institutions, such as the fire department – entities that may have possessed training and expertise in the use of loaders and other construction equipment.

---

[3] As is evident from the facts in Scarangella, that an employer may control a workplace does not necessarily ensure that a product is being used safely and as contemplated at the time of purchase. In lieu of the back-up alarm, the employer directed bus drivers to sound the horn when backing up but there was no evidence that the driver followed that directive and plaintiff testified that she did not hear a horn. Obviously, in that case the employer did not succeed at managing the risk – yet the manufacturer received the benefit of the exception.

We are also unpersuaded that the Scarangella exception was categorically unavailable to Bobcat here because "the person making the purchasing decision on Taylor's behalf was not at risk of personal harm through use of the loader without the optional safety device" (150 AD3d at 156). There is no "risk of personal harm" requirement in Scarangella. It is not unusual for a purchaser to obtain a product contemplating its use by someone else – an employee, co-worker, partner, family member or, as in this case, customer. The fact that the end user may not be the purchaser is also not disqualifying under Scarangella. In fact, in that case the purchasing decision was made -- not by an employee who worked in the bus yard -- but by the president and chief operating officer of the bus company, which owned and operated 190 school buses and had 300 employees.

The Scarangella purchaser undoubtedly took the safety of his employees into account when he made the "considered decision" not to purchase the back-up alarm. We are unwilling to presume, as a matter of law, that a purchaser such as Taylor would not have a comparable interest in the well-being of its retail rental customers. Moreover, unlike the bus company, which was shielded from direct liability for employee injury by the Workers' Compensation Law, Taylor could be – and in fact was – held liable for Fasolas' injuries and, thus, had and retains a pecuniary interest in ensuring the safety of the products rented to its customers. Scarangella's 3-prong test – faithfully applied – already requires assessment of the purchaser's basis of knowledge concerning the scope of the intended uses of the product and its ability to weigh the risks and benefits of available optional safety

devices. There is no need to engraft a "rental market" exemption, nor does our rejection of that approach expand the Scarangella defense.

The misplaced focus on the fact that plaintiff acquired access to the loader through the rental process was not confined to the Scarangella issue. The trial court's product liability charge incorporated the same rental market theory underlying the creation of a blanket exemption from Scarangella and, thus, imparted an improper standard to the jury. Under the pattern jury instructions, which are derived from our governing precedent, the focus of the jury's inquiry as to whether a product is defective is whether "it is not reasonably safe" "for its intended or reasonably foreseeable purpose" (PJI 2:120, citing Voss, supra). A product is "not reasonably safe" if it "is so likely to be harmful to [persons] that a reasonable person who had actual knowledge of its potential for producing injury would conclude that it should not have been marketed in that condition" (id.). In determining whether the product should have been marketed in that condition, the pattern charge instructs the jury to balance "the risks involved in using the product against (1) the product's usefulness and its costs, and (2) the risks, usefulness and costs of the alternative design as compared to the product the defendant did market" (id.). The nature of the market transaction that placed the product in the end-user's hands – whether the product was purchased or rented – is not part of this calculus.

The uncontested trial testimony was that the intended uses of the loader with bucket attachment were to dig or move soil and other loose debris. Bobcat offered evidence that, in this configuration and for this purpose, the loader was safe without the door kit and that the door kit was designed for use with other attachments not purchased by Taylor.

However, by charging the jury that it should consider whether the loader was safe without the door kit for use "in the rental market" – rather than safe for its intended and reasonably foreseeable uses – the court put its imprimatur on the expert's rental market theory. Rather than considering Bobcat's evidence that the loader with the bucket attachment was safe for its intended use without the door kit, the jury was led to believe that the manufacturer had some higher, undefined duty when the product came into the end-user's possession in the course of a rental transaction. Indeed, the modified jury charge here improperly suggested that, when placed in the "rental market," the Bobcat loader had to be reasonably safe for "whatever use" a renter might make of it. Thus, the charge impermissibly expanded the universe of circumstances where the jury could have found the Bobcat product to be defective.

Plaintiff's expert conceded that the rental market theory he advanced would effectively require a manufacturer to include every optional safety device as a standard feature for every piece of equipment it knows is destined for the rental market. As a practical matter, this theory would be unworkable with respect to many products, including this one. The undisputed proof at trial indicated that the loader had 150 attachments that served different purposes and included various safety devices, depending on their function. Under the expert's theory, every safety device available for every attachment would need to accompany every loader entering the rental market. This would significantly raise the cost of the product – perhaps making it prohibitively expensive and, thus, essentially inaccessible to the occasional user that had neither the means nor the desire to purchase a loader. Because the court's jury instructions on defective design erroneously incorporated

the rental market theory as a standard for the manufacturer to meet, Bobcat is entitled to reversal and a new trial on this basis alone.

Having deemed Scarangella to be wholly inapplicable, neither the trial court nor the Appellate Division examined whether Bobcat raised a triable question of fact warranting a Scarangella charge. Because Bobcat is entitled, in any event, to a new trial on the design defect claim due to the error in the strict products liability instruction, we have no occasion to do so either. For purposes of resolution of this appeal, it is sufficient to observe as a matter of law, based on the evidence presented at this trial, that Bobcat was not entitled to a directed verdict in its favor on the Scarangella exception. Whether a Scarangella instruction will be appropriate on retrial is a matter for the trial court to determine based on the evidence presented at that time. Bobcat's evidentiary argument is academic.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, and the motion of defendants Bobcat of Long Island, Inc. and Bobcat Company for a new trial granted.

Fasolas v Bobcat of New York

No. 29

RIVERA, J. (dissenting):

In this appeal, we must determine whether the exception to strict products liability recognized in <u>Scarangella v Thomas Built Buses</u> (93 NY2d 655 [1999]) applies to a manufacturer that sells its product to a rental company, which in turn rents it to an

- 1 -

individual who suffers injuries that were allegedly caused by the manufacturer's failure to install as standard an optional safety device. The majority's expansion of Scarangella to absolve a manufacturer of liability, if the renting company has information about the product and the optional safety equipment that has not been provided to the renter, runs counter to our products liability public policy goals and the instrumentalist rationale of Scarangella.

Contrary to the majority view, under New York's established tort law doctrine and product liability rules for design defect claims, the manufacturer could not avoid its nondelegable duty to produce a safe product based solely on information about the product known to a rental company. Instead, "departure from the accepted rationale imposing strict liability upon the manufacturer" (id., 93 NY2d at 661) was justified only when the ultimate user, or another party in the chain of distribution with control over the use environment, was sufficiently knowledgeable about the product and the optional safety device's availability to conduct an adequate multifactor risk-utility analysis (id.; Voss v Black & Decker Mfg. Co., 59 NY2d 102, 109 [1983]).

Here, the evidence did not establish that the person in the best position to balance the risk and benefits of the product's use without the safety device—the renter—had such knowledge, or that the manufacturer took steps when entering the rental equipment market to ensure the renter would receive the information necessary to engage in a risk utility analysis, even if the manufacturer did not have direct access to the renter. Therefore, the question of the manufacturer's strict liability, based on its introduction into the rental

market of its machinery without the safety device, was properly submitted and charged to the jury. A new trial is not warranted, and I would affirm the order of the Appellate Division.

I.

Manufacturer Products Liability for Design Defects

Before turning to the application of strict liability for a defectively designed product introduced to the ultimate user through a rental market distribution chain, it is important to review, in broad strokes, the development of products liability theory. Generally, this area of law has developed in response to the shortcomings of other legal rules in addressing the costs of injuries caused by changes in the market (Guido Calabresi, A Broader View of the Cathedral: The Significance of the Liability Rule, Correcting a Misapprehension, 77 Law & Contemp Probs 1 [2014]). Its analytical tenets are grounded in social policy concerns and instrumentalist goals (see Michael L. Rustad, Twenty-First-Century Tort Theories: The Internalist/Externalist Debate, 88 Ind LJ 419 [2013]).

A.  Strict Liability for Product Injuries

"In many ways, the birth of modern products liability in the United States can be traced to Judge Cardozo's 1916 majority opinion [] in MacPherson v Buick Motor Co." (Daniel W. Leebron, An Introduction to Products Liability: Origins, Issues and Trends,

1990 Ann Surv Am L 395, 396 [1991]).[1] Judge Cardozo rejected the traditional privity-based liability for negligence that depended on a contractual duty to the purchaser of a product, because "[if] the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger" (MacPherson v Buick Motor Co., 217 NY 382, 389 [1916]). This analysis excised privity as "the principal bar to recovery for persons injured by products" (Product Liability § 1.01). In the century since the MacPherson decision, other jurisdictions have adopted and expanded upon the exception to privity (see e.g. Coakley v Prentiss-Wabers Stove Co., 195 NW 388, 392 [Wis 1923] [collecting cases in other jurisdictions];William J. Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L J 1099, 1101–1102 [1960]).[2] The Restatement of Torts adopted strict liability in 1965 (Restatement [Second] of Torts § 402A), state legislatures enacted product liability statutes, and the jurisprudence continued

---

[1] As one commentator has noted, the groundwork for MacPherson and the national movement leading to "[t]he erosion of the barrier of privity in negligence actions began in 1852 when the New York State Court of Appeals held [in Thomas v Winchester, 6 NY 397 (1852)] that a seller could be held liable to third persons not in privity with the seller for the seller's negligence in the manufacture or sale of products 'imminently' or 'inherently' dangerous to the ultimate user….By the early 1900's, liability was imposed without privity in a few cases involving products that were not in themselves inherently dangerous, but which became so when defectively manufactured" (John S. Allee, Theodore V.H. Mayer, Robb W. Patryk, Product Liability § 1.02 [Law Journal Press 2018]).

[2] Res ipsa loquitur was heavily relied upon during the evolution of this area of torts law (see e.g. Escola v Coca Cola Bottling Co. of Fresno, 24 Cal2d 453, 461 [1944] [Traynor, J., concurring] [concurring in the judgment but stating that strict liability, not res ipsa loquitur, should be the applicable standard, relying on the articulation of the rule in MacPherson]; see generally Matthew R. Johnson, Note, Rolling the "Barrel" a Little Further: Allowing Res Ipsa Loquitur to Assist in Proving Strict Liability in Tort Manufacturing Defects, 38 Wm & Mary L Rev 1197 [1997]).

to develop.[3]  Courts drew from contracts, theories of warranty, as well as tort in adopting

standards for products liability. As noted by the Restatement (Third) of Torts for Products

Liability, "'strict products liability' is a term of art that reflects the judgment that products

liability is a discrete area of tort law which borrows from both negligence and warranty. It

is not congruent with classical tort or contract law" (Restatement [Third] of Torts: Prods

Liab § 1, Comment a). The law expanded to permit claims for failure to warn, instruct,

inspect or test, and for manufacturing and design defects.

As the law developed to recognize strict liability for a manufacturer's defective

design, jurisdictions differed on their approaches for holding a manufacturer liable (see

generally Kyle Graham, Strict Products Liability at 50: Four Histories, 98 Marq L Rev 555

[2014]; Dominick Vetri, Order Out of Chaos: Products Liability Design-Defect Law, 43 U

Rich L Rev 1373 [2009]; David G. Owen, Design Defects, 73 Mo L Rev 291 [2008]).

Current law reflects jurisdictional variations on the same theme: the manufacturer is liable

for a defect in the design of its product that is the proximate cause of a plaintiff's injury.

Examples of product recalls and extensive litigation that have received national attention

over the years easily come to mind—phones unexpectedly catching fire, car ignition switch

---

[3] For a comprehensive discussion of the development of products liability, including strict liability for design defects, see David W. Leebron, An Introduction to Products Liability: Origins, Issues and Trends, 1990 Ann Surv Am L 395 (1991).

flaws, drugs substantially increasing the risk of heart attack and death—and easily illustrate the interest in addressing the harms caused by unsafe products.[4]

The main features of products liability are straightforward: it relieves the plaintiff from establishing that the manufacturer acted negligently in designing the product and generally does not permit shifting preventable risks to consumers (Voss, 59 NY2d at 107 ["Liability attaches when the product, as designed, presents an unreasonable risk of harm to the user"]). The Restatement (Third) of Torts: Products Liability rejected "the 'consumer expectations test' as the governing standard for defining product defect" (Prods Liab § 8, Comment b), and instead adopted a foreseeability test. Thus, a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe" (Restatement [Third] of Torts: Prods Liab § 2[b]).[5] This Restatement also rejected the patent danger rule—which had been adopted by various jurisdictions—meaning manufacturers have a duty to

---

[4] Paul Mozur, Galaxy Note 7 Fires Caused by Battery and Design Flaws, Samsung Says, NY Times, Jan 13, 2017, at B1; Bill Vlasic & Rebecca R. Ruiz, Agency Expects More Deaths from G.M.'s Ignition Flaw, NY Times, May 24, 2014, at B3; Alex Berenson, Merck Agrees to Settle Vioxx Suits for $4.85 Billion, NY Times, Nov 9, 2007 at A1.

[5] To the extent the majority focuses on the fact that Bobcat offered evidence that the loader was safe without the door kit "for [the specific] purpose of mov[ing] soil," (majority op at 12, 14), the majority ignores our settled law that "[a] manufacturer who sells a product in a defective condition is liable for injury which results to another when the product is used for its intended purpose or for an unintended but reasonably foreseeable purpose" (Lugo by Lopez v LJN Toys, Ltd., 75 NY2d 850, 852 [1990] [emphasis added]).

eliminate obvious risks when they can do so by cost-effective design changes (Restatement [Third] of Torts: Prods Liab § 2, Comment d). This reflects the Third Restatement's view that liability for design defects is "predicated on a different concept of responsibility" than, for example, manufacturing defects because design defects are by definition based on "the manufacturer's own design specifications" (Restatement [Third] of Torts: Prods Liab § 2, Comment a). Accordingly, "various trade-offs need to be considered in determining whether accident costs are more fairly and efficiently borne by accident victims, on the one hand, or on the other hand, by consumers generally through the mechanism of higher product prices attributable to liability costs imposed by courts on product sellers" (id.). This devolves to whether the manufacturer has made the choice society is willing to accept as to the balance between the risks of the product as designed and the benefits it provides.

Strict liability is justified by public policies that seek to reduce injuries while acknowledging the benefits of inventions and product development (see Codling v Paglia, 32 NY2d 330, 341 [1973]; Calabresi, A Broader View of the Cathedral, 77 Law & Contemp Probs 1 [discussing the liability rules in tort "as an essential part of the social structure and of the law" and the fundamental public function of tort]). Courts attempt to achieve social goals by adopting standards of strict liability that accomplish any or a combination of the following outcomes: (1) entrepreneurial liability, meaning accident costs are included in the cost of doing business; (2) risk-spreading by manufacturers because they are in a better position "to absorb and allocate risk of injury through price increases, insurance, etc., than those who suffer illness and disability from defective

products" (Prod Liab § 1.04[1]); (3) compensation of innocent victims; (4) deterring the production of unsafe products, and improving product quality; (5) the party that introduces the product into the market bears the costs of injury rather than the customer who is powerless to protect against defective products; and (6) risk control, to ensure liability is placed on the entity "in the best position to understand the nature and the extent of the risk and to control that risk" (Prod Liab § 1.04[1][g]).

B.  Manufacturer Design Defect Strict Liability under New York Law

Our Court has set forth clear rules in this area of law: "[w]here a plaintiff is injured as a result of a defectively designed product, the product manufacturer or others in the chain of distribution may be held strictly liable for those injuries" (Hoover v New Holland N. Am. Inc., 23 NY3d 41, 53 [2014]). Accordingly, "the manufacturer is under a nondelegable duty to design and produce a product that is not defective" (Robinson v Reed-Prentice Div. of Package Machinery Co., 49 NY2d 471, 479 [1980]).

"[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce" (id.). The Court has also explained that "[s]trict products liability for design defect…differs from a cause of action for a negligently designed product in that the plaintiff is not required to prove that the manufacturer acted unreasonably in designing the product. The focus shifts from the conduct of the manufacturer to whether the product, as designed, was not reasonably safe"

(Voss, 59 NY2d at 107). A manufacturer is strictly liable for a design defect because "regardless of [the manufacturer's] lack of actual knowledge of the condition of the product [the manufacturer] is in the superior position to discover any design defects and alter the design before making the product available to the public. Liability attaches when the product, as designed, presents an unreasonable risk of harm to the user" (id.; see also Codling, 32 NY2d at 340 ["In today's world, it is often only the manufacturer who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose"]). "[I]n the products liability cases, rather than arising out of the 'will or intention of the parties,' the liability imposed on the manufacturer is predicated largely on considerations of sound social policy, including consumer reliance, marketing responsibility and the reasonableness of imposing loss redistribution" (Milau Associates v North Ave. Development Corp., 42 NY2d 482, 498 [1977] [internal citations and alternation omitted]), in addition to the social policies already set forth above. Thus, a manufacturer is strictly liable for injuries proximately caused by a design defect in its product (id.).

In Voss, the Court identified seven nonexclusive factors to be considered in balancing the risks created by the product's design against its utility and cost, including: "(1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have

avoided injury by careful use of the product; (6) the degree of awareness of the potential

danger of the product which reasonably can be attributed to the plaintiff; and (7) the

manufacturer's ability to spread any cost related to improving the safety of the design" (id.

at 109). The requisite

> "analysis is rooted in a recognition that there are both risks and benefits
> associated with many products and that there are instances in which a
> product's inherent dangers cannot be eliminated without simultaneously
> compromising or completely nullifying its benefits. In such circumstances, a
> weighing of the product's benefits against its risks is an appropriate and
> necessary component of the liability assessment under the policy-based
> principles associated with tort law" (Denny v Ford Motor Co., 87 NY2d 248,
> 257 [1995] [internal citation omitted]).

Similar to the view of the Third Restatement, the Court has acknowledged that unlike

manufacturing defects, "[i]n design defect cases, the alleged product flaw arises from an

intentional decision by the manufacturer to configure the product in a particular way" (id.

at 257, n 3). The Court has thus recognized that this risk-utility analysis is "closer to that

used in traditional negligence cases, where the reasonableness of an actor's conduct is

considered in light of a number of situation and policy-driven factors" (id. at 267;

Restatement [Third] of Torts: Prods Liab § 1, Comment a).

In Scarangella v Thomas Built Buses, this Court recognized an exception to a

manufacturer's strict liability for a design defect and shifted the manufacturer's

responsibility for the risk-utility analysis to a buyer with superior knowledge about the

risks and benefits of the buyer's contemplated use without the optional safety device.[6] "In

an effort to lend predictability to litigation of this kind," (Passante v Agway, 12 NY3d 372,

384 [2009]), the Court identified "some governing principles for cases where a plaintiff

claims that a product without an optional safety feature is defectively designed because the

equipment was not standard" (Scarangella, 93 NY2d at 661).

> "The product is not defective where the evidence and reasonable inferences
> therefrom show that: (1) the buyer is thoroughly knowledgeable regarding
> the product and its use and is actually aware that the safety feature is
> available; (2) there exist normal circumstances of use in which the product is
> not unreasonably dangerous without the optional equipment; and (3) the
> buyer is in a position, given the range of uses of the product, to balance the
> benefits and the risks of not having the safety device in the specifically
> contemplated circumstances of *the buyer*'s use of the product. In such a case,
> the buyer, not the manufacturer, is in the superior position to make the risk-
> utility assessment, and a well-considered decision by the buyer to dispense
> with the optional safety equipment will excuse the manufacturer from
> liability. When the factors are not present, there is no justification for
> departure from the accepted rationale imposing strict liability upon the
> manufacturer because it 'is in a superior position to discover any design
> defects'" (Scarangella, 93 NY2d at 661, quoting Voss, 463 NY2d at 107).

Our Court has since clarified that "[u]nder Scarangella, the second question is not

whether equipment 'would normally be used' without unreasonable danger; it is whether

'there exist normal circumstances of use' where the danger is not unreasonable. In other

words, if there exist buyers who use the product normally and can forgo the safety feature

---

[6] Scarangella recognized a limited exception to our products liability rules that applies
solely to a manufacturer's optional safety device, and not to any possible "accessory," as
suggested by the majority (majority op at 10).

without unreasonable risk, the judgment as to which buyers ought to do so is left to the buyers themselves" (Passante, 12 NY3d at 385).

In those cases where a defendant manufacturer argues that the exception applies, the trial court conducts an analysis in accordance with the principles set forth in Scarangella to determine whether the plaintiff made a prima facie showing that the manufacturer's failure to install the optional safety device is a design defect, so as to present a triable issue of fact for the jury on that question. If the court concludes the plaintiff has met this threshold burden, the jury is charged with determining "if a reasonable person who knows or should have known of the product's potential for causing injury and of the feasible alternative design[s] would have concluded that the product should not have been marketed in that condition" (PJI 2:120; Voss, 59 NY2d at 108-109). In reaching its verdict, the jury must "balance[e] the risks inherent in the product, as designed, against its utility and cost," weighing such relevant factors as those recognized in Voss (see Voss, 59 NY2d at 109).[7]

II.

Scarangella Applies Solely to Cases Where the Ultimate User or Purchaser
with Control Over the Use Environment Has Special Knowledge

---

[7] To the extent the majority suggests that a plaintiff must produce expert testimony to prove that Scarangella does not apply (majority op at 5), the law is to the contrary. Scarangella does not require expert testimony by the plaintiff; instead, the court's analysis is based on the information about the product, the safety device, and the use environment – information which is a defendant's burden to bring forward to establish that the exception applies (see Passante v Agway Consumer Products, Inc., 12 NY3d 372, 381 [2009] [defendants' burden to make a prima facie showing of entitlement to judgment as a matter of law on Scarangella factors]).

Defendant is a manufacturer who argues that the <u>Scarangella</u> exception to strict products liability applies because the rental company to which it sold its injury-causing product had knowledge about the machine and the available optional safety device to make the requisite risk-utility analysis. This application of <u>Scarangella</u>—which shifts the balancing of risks and benefits to a rental company that is neither the ultimate user nor has control over the use environment—and now adopted by the majority—is inapt. The exception recognized in <u>Scarangella</u> to strict liability applies when the party has adequate information about the product and the optional safety device, along with superior knowledge to that of the manufacturer of the circumstances of the particular use. In a case involving the rental market, that party is the renter, not the rental company.[8]

A. <u>The Underlying Litigation</u>

Sofia Fasolas, as administrator of Elias Fasolas's estate, commenced this wrongful death action, alleging strict liability for defective design and manufacture, negligence, breach of express and implied warranties, and failure to warn. As established at trial, Elias Fasolas rented a Bobcat S 175 skid-steer loader with a bucket attachment from defendant-

---

[8] No party requests that we revisit <u>Scarangella</u>'s underlying presumptions or ultimate holding to absolve a manufacturer of strict liability based on a purchaser's knowledge of the product's risks and uses. Given that the parties do not challenge the framework adopted in that case, I have no occasion to opine on the soundness of the <u>Scarangella</u> approach to products liability as a general matter, nor the more discrete question whether application of <u>Scarangella</u> to an employer—a party typically free of tort liability under Worker's Compensation laws—should be reconsidered (<u>see</u> James A. Henderson Jr. & Aaron D. Twerski, <u>Optional Safety Devices: Delegating Product Design Responsibility to the Market</u>, 45 Ariz St LJ 1399, 1410 [2013]).

respondent Port Jefferson Rental Center, Inc., d/b/a Taylor Rental Center (Taylor). Taylor purchased the loader from defendant Bobcat Long Island, Inc. (Bobcat LI), the distributor for manufacturer defendant Bobcat Company (Bobcat). Taylor rents various products, including Bobcat machinery, to the general public.

For over 50 years, Bobcat has built "compact equipment" and leads the industry in the design, manufacture, marketing, and distribution of this equipment for construction, rental, landscaping, agriculture, grounds maintenance, government, utility, industry, and mining.[9] Bobcat's brochure at the time of the incident asserted that its skid loaders set the standard for design, productivity, and comfort and that the loaders were "state of the art."

The loader is a piece of machinery that could be outfitted with up to 150 different attachments to allow it to be used for numerous landscaping-type tasks. Among those attachments are the "bucket attachment"—either with or without "teeth"—that could be used to move and pick up dirt, broken branches, downed trees, and debris. A bucket with teeth can dig and loosen up packed soil. Bobcat also manufactured an optional special applications kit which could be purchased for installation on the loader. As relevant here, the kit included a thick plastic front door for the operator cab—what the parties refer to as the optional safety device. The Bobcat defendants presented evidence at trial that it recommended installation of the door when the loader was used with attachments that

---

[9] Bobcat, "Overview," https://www.bobcat.com/company-info/about/overview (last visited April 10, 2019). According to Bobcat's website, its brand has "earned the nickname 'One Tough Animal.'"

created the risk of flying debris—such as the drilling attachment. The door was not recommended when the loader was used to move and level soil because it would obstruct the user's visibility and make it more difficult to escape the cab. It is undisputed that Taylor purchased at least eight loaders over the course of five years but did not purchase the kits or have the doors installed on the loaders.

Elias rented the loader without the door from Taylor for personal use, to clear land on his family's property. He died while operating the loader when a small tree entered the open front section of the cab and pushed him back, pinning him against the back wall and ceiling of the cab. While the tree did not enter his body, he was pushed up and crushed to death by the tree. The tree pushed Elias off the controls (which are hand controlled) and unable to reach them, Elias could not move the loader to back it off the tree. The end of the tree remained rooted in the ground. There was evidence that Elias likely suffered pain and terror for approximately five to ten minutes as he died. Plaintiff claimed that the loader without the door was a design defect that proximately caused Elias's death. Plaintiff's expert testified that, given the product was entering the rental market, it was defectively designed to not have the thick plastic door as a standard feature.

The testimony of both Taylor employees was consistent with their having learned of the availability and purpose of the kit and the door specifically only after Elias's accident. Although a Bobcat LI employee would go through a checklist with a Taylor employee upon delivery of a loader, the checklist had 20 different items on it and did not mention the door by name. Bobcat's brochure mentioned the availability of the "special

applications kit," which apparently included the door, but did not contain specific language about the door or its purpose.

Supreme Court denied the Bobcat defendants' request for a jury charge on the Scarangella exception and charged the jury on whether the product was defectively designed for use in the rental market. The jury returned a verdict in favor of plaintiff, and, as relevant here, apportioned each Bobcat defendant twenty-five percent liability on a defective design theory. Supreme Court denied defendants' pre- and post-verdict motions seeking to avoid liability, concluding that Scarangella was "not applicable" because Taylor was not the ultimate user. The Appellate Division affirmed, holding the Scarangella exception inapplicable because the manufacturer sold to a rental company knowing that the company would rent to persons over whom it had no control and who might lack expertise in operating the equipment (150 AD3d 147 [2017]).

### B. A Manufacturer Remains Strictly Liable for Design Defects When It Enters the Product Rental Market

The majority adopts the view, advocated here, that the exception recognized in Scarangella applies to absolve the manufacturer of strict liability for a design defect when it sells its product to a rental company that has knowledge about the product and the manufacturer's optional safety device (majority op at 2, 12). The majority's analysis mischaracterizes the relevant question as "whether the exception is categorically unavailable when the allegedly defective product came into the injured end user's hands through the rental market, rather than by a purchase transaction" (majority op at 2, 10). The

question is not whether the end user rented or purchased the product, but whether the end

user has the type of knowledge necessary to make the risk-benefit analysis that traditionally

falls to the manufacturer. The majority's rejection of a "'rental market' exclusion from

Scarangella (majority op at 2) is an answer in search of a problem. It is already the case

that a rental company is subject to claims for liability for its role in the distribution chain

of an allegedly defectively designed product (Restatement [Third] of Torts: Prods Liab §

20 [b] ["Commercial nonsale product distributors include, but are not limited to, lessors,

bailors, and those who provide products to others as a means of promoting either the use

of consumption of such products or other commercial activity"]). The real issue is whether

the manufacturer may escape strict liability by choosing to distribute its product through a

third-party rental company. Our cases, including Scarangella, do not mandate absolution

where the information available to the buyer fails to place the buyer in the position of "a

highly knowledgeable consumer" (Scarangella, 93 NY2d at 661).[10]

---

[10] The majority's contention that holding a manufacturer strictly liable for design defects when the manufacturer sells to a rental agency is "unworkable" (majority op at 15) reflects a misunderstanding of the plaintiff's theory and the facts in the appeal before us, as well as basic products liability doctrine. The majority claims that because the loader had 150 attachments that served different purposes "every safety device available for every attachment would need to accompany every loader entering the rental market" (id.). There was no testimony at trial suggesting any other potential safety devices – rather a single safety device (the door) that was already recommended by Bobcat for multiple iterations of the product. Additionally, pointing out the complexity of the product and the many considerations involved in analyzing the risk-utility tradeoff for each of 150 uses only further suggests that the manufacturer of such a specialized product is typically in a far better position to conduct such an analysis.

The facts of Scarangella illustrate the point. The third-party defendant in that case was a bus company that declined an optional back-up alarm for its fleet of buses. The company had decades of information and experience about how school buses function, the conditions under which the buses would be used without the optional back-up alarm device, and knowledge about the risks to its bus driver employees if it did not use the back-up alarm (id.) Although the defendant manufacturer did not sell to the end user (i.e., the bus drivers), it sold to their employer—the party that instructed the drivers and wielded control over the environment in which the product was used. Indeed, because of the bus company's unique experience, it had access to information about the product and the safety device and the environment in which the buses would be moved. As a consequence of this base knowledge, the company was able to weigh the risks of forgoing use of the back-up alarm.

The justifying premise of Scarangella— that "the buyer, not the manufacturer, is in the superior position to make the risk-utility assessment, [such that] a well-considered decision by the buyer to dispense with the optional safety equipment will excuse the manufacturer"—has no application where the manufacturer relies on the rental company's knowledge alone. The rental company is not the end user and, unlike the bus company in Scarangella, the rental company has no control over the environment in which the product will be used.

It is the renter and not the rental company that is "in the best position to make the cost-benefit analysis and act upon it" (Guido Calabresi & Jon T. Hirschoff, Toward a Test for Strict Liability, 81 Yale L J 1055, 1063 [1972]). Indeed, because the rental company

has no control over how the product will actually be used, the only way a rental company can assure that it does not run afoul of the majority's interpretation of <u>Scarangella</u> is to purchase all the optional safety equipment, or not rent the machinery at all. The former essentially makes the optional device standard for rental purposes; the latter removes from the market a multipurpose product with various beneficial uses that in certain circumstances is not unreasonably dangerous without the safety device. Neither outcome furthers the public policy goals of risk control, allocative efficiency,[11] and consumer autonomy that justify our state's products liability rules.

The majority contends that whether the purchaser "exercises control over the product's use in its capacity as an employer or otherwise is a consideration that is relevant to a determination of the buyer's relative 'position' to engage in the proper balancing inquiry—but it is not dispositive" (majority op at 12). The majority argues that the facts of <u>Scarangella</u> demonstrated that the employer was not able to sufficiently control the workplace to ensure the product's safe use. However, the question is not whether the buyer <u>succeeded</u> in making the environment accident-proof. The question is whether <u>at the time of purchase</u> the buyer was in a <u>better</u> position than the manufacturer to properly balance the product's utility and risks without the optional safety device. <u>Scarangella</u> recognized that a manufacturer was not liable in those rare cases where the purchaser was sufficiently

---

[11] Allocative efficiency is an economics theory of tort law which focuses on the optimal distribution of goods and services, taking into account consumer preferences. When the output of production is as close as possible to the marginal cost the market has achieved allocative efficiency.

knowledgeable and motivated to make that determination. Central to the analysis was our Court's recognition that the persons at risk from the decision not to purchase the optional safety device were the buyer and "almost exclusively" those within the buyer's employ who were specifically instructed and required to use the product in a certain manner as part of their employment (Scarangella, 93 NY2d at 662). The scenario presented here is akin to a leasing arrangement, which generally does not absolve a manufacturer of strict liability for a design defect merely by selling the product to a lessor. Rather, both may be liable, and a commercial lessor of a particular product can be strictly liable, just like the manufacturer (see Michael Weinberger, New York Products Liability, 2d § 5:7 [Thomson Reuter 2019]; Assam v Deer Park Spring Water, Inc., 163 FRD 400, 405 [EDNY 1995] [applying New York law]; Winckel v Atlantic Rentals & Sales, Inc., 159 AD2d 124 [2d Dept 1990]; Buley v Beacon Tex-Print Ltd., 118 AD2d 630, 631 [2d Dept 1986]; Natasi v Hochman, 58 AD2d 564 [1st Dept 1977]). New York and "[m]ost jurisdictions that have adopted the doctrine of strict liability in products liability have also, when faced with the question, applied the doctrine to commercial lessors or bailors or products, or to lease transactions which are commercial in nature and are not isolated cases" (Am L Prod Liab 3d § 36:19; see also Restatement [Third] of Torts: Prods Liab § 1, Comment b ["The rule stated in this Section applies not only to sales transactions but also to other forms of commercial product distribution that are the functional equivalent of product sales"]; Restatement [Third] of Torts: Prods Liab § 20[b] ["Commercial nonsale product distributors include, but are not limited to, lessors, bailors, and those who provide products

as a means of promoting either the use or consumption of such products or some other

commercial activity"]).[12]

## III.

### Additional Policy Concerns

Several policy concerns further inform and confirm this analysis, as viewed through

the lens of our approach to strict liability for defectively designed products (illustrated by

the Voss line of cases) and this Court's cabining of manufacturer liability in optional safety

equipment cases in accordance with the principles set forth in Scarangella. These policy

matters provide useful insight for the future development of New York's strict liability law

now that the majority has sanctioned the reallocation of the burdens of risks and uncertainty

from manufacturer to nonuser purchaser.

First, the question of who is best positioned to control risk is made more difficult

when the product has multiple uses, some of which are not intended to be used with the

optional safety device. In these cases, the purchaser knows what function the product will

be performing and dictates a particular use. As such, the argument goes, as between the

manufacturer and the purchaser, the purchaser is in a better position to control the risks. To

be contrasted are single-purpose products, in which case the manufacturer knows how the

---

[12] The majority's assertion (majority op at 11) that no other court has reached the conclusion that Scarangella has no application where the product is sold to a rental company is of no moment, and a transparent attempt to bolster its flawed analysis. The fact is no published opinion other than the Appellate Division decision here has addressed the issue and the majority can point to none.

product is intended to be used and the risks that arise from that specific use. The manufacturer is therefore the party in the best position to know the product's dangers and avoid or account for accident costs. Application of Scarangella to a rental company, however, only further confuses the analysis as the company is neither the user nor the party that may dictate the renter's actual use.

Second, and relatedly, the Scarangella approach depends on the purchaser having the capacity to process and make informed decisions based on information about the safety device, the purchaser's particularized knowledge about the use environment and the purchaser's assessment of the risks of use without the safety device and the purchaser's ability to avoid that risk (93 NY2d at 661). Tests that depend on purchaser knowledge have been criticized as failing to contend with the unsophisticated customer (see Henderson & Twerski, 45 Ariz St LJ 1399). Applying these same concerns to the rental market, where the customer base includes occasional or one-time renters with a limited foundational knowledge about the product and its uses, it is unrealistic to assume the renter, by mere fact of having access to certain information, will adequately process the rental company's explanation of the purpose of the optional safety device, and then engage in a multifactor risk-utility assessment. We need only consider the weekend do-it-yourself gardener or home-owner who rents a machine at the local store and after a five-minute explanation on how to use it, is assumed to have the same understanding and skills to deploy the machine as skilled contractors and those who regularly work with machinery. How is that inexperienced person going to make an analysis that has traditionally been placed on the

manufacturer? How are they to consider whether they can avoid the risk? (Biss v Tenneco, 64 AD2d 204, 207 [4th Dept 1978] [manufacturer not liable because purchaser was "the party in the best position to exercise an intelligent judgment to make the trade-off between cost and function, and it is (the purchaser) who should bear the responsibility if the decision on optional safety equipment presents an unreasonable risk to users"]). This may appear simple enough when the user is assessing a common product, with a low risk of injury, but construction machinery is a far cry from a blender.

Third, treating the rental company as the buyer for Scarangella purposes still requires that the manufacturer provide information about the product and the optional safety equipment, but only to the rental company. This is not good public policy. Rather than abandon the manufacturer strict liability rule, we should retain the liability framework that holds liable every party in the distribution chain. Under that framework, the manufacturer is free to impose a contractual obligation on the rental company to include provision of the type of information necessary for a renter to make an adequate risk-utility analysis. Indeed, in the leasehold context, New York courts have noted that the lease and the user's guide provided by the lessor could include just such information (Cordani v Thompson & Johnson Equip. Co., 16 AD3d 1002, 1003–1007 [3d Dept 2005]; Patane v Thompson & Johnson Equip. Co., 233 AD2d 905 [4th Dept 1996]).

Fourth, the majority's approach ignores the fact that the manufacturer chose to enter a market whereby it makes what amounts to an indirect sale. Indeed, the majority's decision to permit the manufacturer to delegate to the rental company the manufacturer's

responsibility to the ultimate user advances no public policy. If the manufacturer injects itself into this market but has no reasonable basis to know whether the end user is "a knowledgeable consumer"—meaning the manufacturer has no way to be reasonably certain that the renter is thoroughly knowledgeable about the product and the safety device, and capable of balancing the benefits and risks of not using the safety device for the user's intended purpose—the manufacturer should not be relieved of its nondelegable responsibility to provide the consumer with a safe product. This undermines an intended goal of products liability: to reduce injury and all the economic harms that flow from them by incentivizing manufacturers to design and produce products reasonably safe for their intended use (Restatement [Third] of Torts: Prods Liab). The facts of this appeal are worthy of note on this point. Bobcat knew that Taylor never purchased the optional safety device even though the rental customer base was not exclusively experienced renters of construction and landscaping machinery of the type at issue here. Yet, Bobcat regularly introduced its products into this rental market for years and profited from that business model. Under these circumstances it retained the duty to provide a product that was not defective for the needs of that market.

Maintaining the responsibility and strict liability with the manufacturer keeps the focus on safety in the hands of the party best positioned to make design and production choices. Further, and as explained above, nothing prevents a manufacturer from entering a contract agreement with the rental company to ensure that use of its product is adequately explained to the end user so as to avoid injury through unsafe uses.

IV.

Manufacturer Bobcat's Strict Liability Was Properly Submitted to the Jury

For the reasons I have discussed, the underlying premise of Scarangella does not apply to a rental company like Taylor as it lacks control over the product use and the use environment. Therefore, the narrow exception to a manufacturer's strict liability does not bar a plaintiff's design defect claim based solely on the rental company's knowledge about the product and the optional safety device. Here, Supreme Court did not err in denying defendants' CPLR 4404 motion to set aside the verdict on the ground that plaintiff failed to establish a prima facie case of design defect because no evidence established that Elias had superior knowledge to that of defendant Bobcat manufacturer that permitted him to conduct an adequate risk-utility analysis.[13]

Nor is a new trial required based on the court's failure to charge the jury on the Scarangella factors. The majority is incorrect that the charge—a modified version of the strict products liability Pattern Jury Instruction 2:120—was erroneous because it referred to the rental market (majority op at 2, 8, 14-15) and wrongly suggests that the applicability of Scarangella and the rental market charge were related (majority op at 15). A court is not required to follow the Pattern Jury Instructions and should instruct the jury on "what the

---

[13] Under the majority's interpretation of Scarangella—meaning the exception applies to a rental market, and that the factors set forth in that case apply to the buyer rental company, not the renter—the Bobcat defendants failed to establish both that Taylor had superior knowledge of the product and that it was actually aware of the safety device (the first Scarangella factor). Thus, the question of defendants' liability was for the jury to decide in accordance with established manufacturer strict liability design defect doctrine.

factual contentions of the parties are with respect to the legal principles charged" (Siegel, NY Prac § 398, at 598 [2d ed]). Here, the court decided to charge the jury based on the specific facts of the case, not based on any consideration that the <u>Scarangella</u> exception did not apply. The fact that Elias rented the skid loader was undisputed and relevant to whether under the circumstances of his acquisition of this machine—namely by renting the Bobcat loader from Taylor—Elias was capable of balancing the risks and benefits. Plaintiff's theory of design defect, which the jury was free to reject, was that Bobcat actively pursued the rental market, including encouraging its distributors to directly rent its loaders even without a safety device, and as such, the product was defectively designed for Bobcat's foreseeable users. Accordingly, the trial court properly charged the jury, and because no error is apparent warranting rejecting the jurors' verdict that Bobcat was liable for a defectively designed product that proximately caused Elias's fatal injuries, the Appellate Division should be affirmed.[14]

I dissent.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order insofar as appealed from reversed, with costs, and motion of defendants Bobcat of Long Island, Inc. and Bobcat Company for a new trial granted.  Opinion by Chief Judge DiFiore.  Judges Stein, Fahey, Garcia, Wilson and Feinman concur.  Judge Rivera dissents and votes to affirm in an opinion.

Decided May 9, 2019

---

[14] Defendants' other arguments are without merit.